GARLAND, A MINOR, APPELLEE, *v.* DUSTMAN, SHERIFF, ET AL., APPELLANTS.

294

(No. 384—Decided September 26, 1969.)

*M. William F. Manlove,* for appellee.
*Mr. Seabury H. Ford,* for appellants.

STRAUB, J.  This cause was conveniently consolidated with a companion case for trial in the Common Pleas Court, and both cases were appealed jointly. However, for the reason that the legal issues in the two cases are totally different, it becomes necessary to consider each case separately on appeal. The plaintiff, Betty Garland, as mother and next friend of Wilbur Garland, a minor, filed an action for false imprisonment against Ross Dustman, the Sheriff of Portage County, and the Western Surety Company, the indemnitor on the sheriff's bond. The plaintiff claims that the sheriff, through the acts of his deputies, falsely imprisoned Wilbur Garland, aged 8, in the courthouse jail in Portage County, in violation of the provisions of Section 2151.34, Revised Code.

There is practically no material dispute in any of the facts involved. On September 20, 1965, at 1:30 a. m., Deputy Sheriff Wilson, accompanied by Deputy Nicola, appeared at the Garland residence with a valid warrant and arrested Norman Garland on a charge of receiving stolen property. Garland informed the deputies that his eight-year-old son, Wilbur, was sleeping in the residence, that the mother was not at home and that there was no one to look after the boy. The Garland residence did not have a telephone, so Norman Garland was unable to contact his wife at that time. Deputy Nicola, by means of the two-way radio in the

sheriff's cruiser, contacted Sergeant Deputy Shoenfelt, who was in charge of the night shift at the Portage County Jail. Deputy Nicola informed the sergeant of the situation regarding the boy, Wilbur. Sergeant Shoenfelt telephoned Walter Kramer, the Chief Probation Officer under the Juvenile Court in Portage County. Kramer instructed the sergeant to have the deputies bring the boy, Wilbur, along with the arrested father, Norman, and both the father and son were to be placed together in the juvenile ward in the courthouse jail until such time as the boy's mother could be contacted to come and get her son. In accordance with these instructions, Norman Garland and the boy, Wilbur, were taken by the deputies to the county jail, located on the first floor of the courthouse, where the father was booked at about 2 a. m. At that time, the father was permitted the use of the sheriff's telephone, and he contacted the mother, Betty, and explained that the boy, Wilbur, was with him and that she was to come to the jail and take him home. Then, in accordance with the instructions of Kramer who, at the time of the trial, held the title Director of Juvenile Court, both the father and the boy, Wilbur, were placed in the juvenile ward on the second floor of the courthouse. There were no other persons, adult or minors, detained at that time in the juvenile ward, and the father and the son remained there alone for approximately one-and-one-half hours. There is no evidence that while Wilbur was in the jail, courthouse or juvenile ward he came in contact or communication with any adult convicted of crime or under arrest and charged with crime, other than his father. About 3:30 a. m., the mother, Betty Garland, appeared at the jail and immediately took the boy home. After the mother and the boy, Wilbur, departed, the father, Norman, was transferred by the jailer from the juvenile ward on the second floor to the third floor of the courthouse, which is the jail for all adult, male prisoners who are detained in locked cells.

The claim of the plaintiff for recovery of damages against the sheriff was predicated on the following provisions of Section 2151.34, Revised Code:

"No child under eighteen years of age shall be plac-

ed in or committed to any prison, jail, or lockup, nor shall such child be brought into any police station, vehicle, or other place where such child can come in contact or communications with any adult convicted of crime or under arrest and charged with crime; * * *.''

In the charge and instructions to the jury in the trial court, the judge instructed the jury as follows:

"The court says to you, as a matter of law with reference to the taking of young Wilbur with them when they took Norman J. Garland to the county jail, with reference to the actual placing of the child in the custody of the Sheriff through his deputy, as a matter of law, the proper procedure was followed.''

However, the court instructed the jury as follows:

"Therefore, the court says, as a matter of law, with reference to the placing of the child who legally was placed in the custody of the deputies and bringing of this child under the age of fourteen to the police station and placing him in a cell locked at the end of the hall does, as a matter of law, constitute false imprisonment of the boy, from that time until such time as he was released * * *''

It is significant that Section 2151.34, Revised Code, is captioned, ''[DISTRICT DETENTION HOMES] Section 2151.34 PLACE OF DETENTION FOR CHILDREN; DISTRICT DETENTION HOMES.'' The first paragraph of the section is the paragraph referred to above with reference to the placing and detention of minors under eighteen in a prison, jail, or lockup. We now quote from the second paragraph of this section as follows:

"Upon the advice and recommendation of the judge, the board of county commissioners shall provide, by purchase, lease, construction, or otherwise, a place to be known as a detention home, which shall be within a convenient distance of the juvenile court, and not used for the confinement of adult persons charged with criminal offenses, where delinquent, dependent, neglected children, or juvenile traffic offenders may be detained until final disposition. Upon the joint advice and recommendation of the juvenile judges of two or more adjoining or neighboring

counties, the boards of county commissioners of such counties shall form themselves into a joint board, and proceed to organize a district for the establishment and support of a detention home for the use of the juvenile courts of such counties, * * *."

These two paragraphs under Section 2151.34, Revised Code, are analogous to former Section 1639-22, General Code, and have been in effect since the year 1937 (117 Ohio Laws 520, 526). These two paragraphs of the statute are clear and unambiguous and make it mandatory for the county commissioners in every county in Ohio, upon the advice and recommendation of the Juvenile Judge, to provide a place known as a Juvenile Detention Home and prohibit the placing or detention of juveniles under eighteen in a jail or prison. These sections were held to be mandatory on the part of the juvenile authorities and the county commissioners in the case of *State, ex rel. Ray, Judge,* v. *South,* 176 Ohio St 241. Regardless of the above sections requiring each county in Ohio to have a Juvenile Detention Home, the evidence in this case is that the only facility in Portage County in which to place and detain juveniles up to the time of trial, 1968, was the juvenile ward located on the second floor of the courthouse and which place or area had been expressly authorized by the Juvenile Judge of Portage County. This juvenile ward is a separate and secluded section, and the only other section on the second floor is the separate quarters designated for the female inmates of the county jail. The adult male section of the county jail is located on the third floor of the courthouse.

If the juvenile ward on the second floor does not comply with the mandatory provisions of Section 2151.34, Revised Code, as being a proper Juvenile Detention Home, the dereliction and neglect of failing to provide a proper Juvenile Detention Home must be assessed against the Juvenile Judge and the County Commissioners of Portage County.

In the answer filed by the defendant sheriff, he denied that the boy, Wilbur, was arrested, incarcerated or held in

custody by his deputies; but alleged that the boy accompanied his father at the father's request, and that the child was placed under the protective jurisdiction of the Juvenile Court until the boy's mother arrived and took him home. The sheriff then specifically denied in his answer that at any time whatsoever the minor child was in the custody of his department or his deputies.

In his charge to the jury, the trial judge defined false imprisonment as follows:

"False imprisonment is the unlawful arrest of a person of another either with or without a warrant or other process. It consists of an unlawful restraint upon a man's person or control over the freedom of his movements, by force or threat; and every such restraint or confinement is unlawful where it is not authorized by law. The actual detention and the unlawfulness thereof constitutes the trespass, the gravamen being the unlawfulness of the imprisonment or detention."

We find the following comment under the topic "False Imprisonment" in 35 Corpus Juris Secundum 628, Section 6, captioned, "Intent," as follows:

"To constitute false imprisonment there must be an actual or legal intent to restrain plaintiff, although there need be no intent to arrest. *Where the restraint is accidental, or incidental to plaintiff's welfare, * * * it has been held not to constitute false imprisonment."* (Emphasis ours.)

The evidence in this case is manifest that every deputy sheriff involved acted in good faith for the best interests and welfare of the boy, Wilbur, and there was at no time any intent to restrain him as an inmate in custody. The detention of the boy, Wilbur, was incidental to the boy's own welfare and was to endure briefly until he was picked up by his mother.

There is considerable authority that to constitute a false imprisonment the detention involved must be an unreasonable detention. In 23 Ohio Jurisprudence 2d, discussing the essential elements of false imprisonment, from page 411, Section 6, we quote:

"* * *The question is whether the acts complained of were legal; and if a detention is unlawful, that is, if it is *unreasonable,* * * *." (Emphasis ours.)

We quote from the same authority, from page 434, Section 36, captioned, "Questions of Law and Fact; Direction of Verdict," as follows:

"The question as to what constitutes *an unreasonable detention* is one for the jury to determine under the facts and circumstances of each particular case. * * *" (Emphasis ours.)

Was the keeping or detention of the boy, Wilbur, until the mother arrived, an unreasonable detention? The father of the boy was permitted the use of the sheriff's telephone when he and Wilbur arrived at the sheriff's office in the county jail at approximatly 1:30 a. m. to 2:00 a. m. The father informed the mother that their son, Wilbur, was with him and that she was to come and take Wilbur home. Had there been a telephone in the Garland residence, the father could have contacted the wife from their residence before he dressed Wilbur and departed for the jail. This would have certainly alleviated or lessened the time Wilbur was to be kept, pending the arrival of the mother. In answer to the father's telephone call, had the mother arrived at the jail within a period of five minutes and had taken Wilbur home at that time, there could be little, if any, contention that it would have been ruled as an unreasonable detention. Or, if the mother had arrived within a period of fifteen or twenty minutes after the telephone call, would the detention be any more unreasonble? The mother, Betty Garland, testified that she did not get to the courthouse until 3:30 a. m. because it was raining and sleeting. Under the law, the unreasonable detention must have been caused by or resulted from the acts of the sheriff's deputies. Here the factors which caused the detention to endure for one-and-one-half hours were conditions over which the sheriff's deputies had no control, and the lapse or length of time of the detention was a matter solely under the province and actions of the mother and the father.

Under the law of false imprisonment, the defenses available to a charge of a false imprisonment are enumerated in 32 American Jurisprudence 2d 141, as follows:

"To avoid liability in an action for false imprisonment either the defendant must show that he did not imprison the plaintiff or he must justify the imprisonment. * * *,,

It is the contention of the defendant sheriff that his deputies placed Wilbur alone with the father in the juvenile ward in compliance with the directions or order of the chief probation officer of the Juvenile Court and, therefore, any detention or false imprisonment of Wilbur by his deputies was justified under the law.

In the Juvenile Code of the state of Ohio, Section 2151.31, Revised Code, in the third paragraph thereof, it is provided as follows:

"This section does not forbid any peace officer, police officer, probation officer, or other person authorized by the juvenile judge from taking into custody any child who is found violating any law or ordinance, or who is reasonably believed to be a fugitive from his parents or from justice, *or whose surroundings are such as to endanger his health, morals, or welfare.*" (Emphasis ours.)

We quote also the last sentence of the same paragraph as follows:

"In every such case the officer taking such child into custody shall immediately report the fact to the court and the case shall then proceed as provided in Sections 2151.01 to 2151.54, inclusive, of the Revised Code."

Also in the Ohio Juvenile Code, under the caption, "DUTIES AND POWERS OF PROBATION DEPARTMENT; RECORDS; COMMAND ASSISTANCE," is Section 2151.14, Revised Code, from which we quote as follows:

"The chief probation officer, under the direction of the juvenile judge, shall have charge of the work of the probation department. * * *,,

We quote further from the second paragraph of the same section, in-part, as follows:

"A probation officer may serve the process of the

court within or without the county, and may make arrests without warrant upon reasonable information or upon view of the violation of Sections 2151.01 to 2151.54, inclusive, of the Revised Code, detain the person arrested pending the issuance of a warrant, and perform such other duties, incident to his office, as the judge directs. *All sheriffs, deputy sheriffs*, constables, marshals, chiefs of police, and other police officers *shall render assistance to probation officers* in the performance of their duties *when requested to do so by any probation officer.*" (Emphasis ours.)

The authorities under the law of false imprisonment generally agree that judges and quasi-judicial officers are immune from liability for causing the detention of a person when they are acting within the scope of their jurisdiction of the office. (32 American Jurisprudence 2d 116.) Under these authorities, the Judge of the Juvenile Court of Portage County and the chief probation officer of that court could not be held liable for the alleged false imprisonment of Wilbur Garland. Sections 2151.31 and 2151.-14, Revised Code, hereinbefore quoted, impose specific duties on the part of the sheriff's deputies to assist the juvenile authorities and to comply with the orders and directions of such juvenile probation officers and authorities. A refusal on the part of the sheriff's deputies to so comply or a failure to so act as directed by the juvenile authorities would be in violation of the above quoted sections of the Juvenile Code of Ohio.

Walter Kramer testified he had been Chief Probation Officer of the Juvenile Court of Portage County for eighteen years. In February 1968, he was named Director of the Juvenile Court by the Juvenile Judge, and he testified that there were two other probation officers working in Juvenile Court under his direction. As previously stated herein, Mr. Kramer further testified that the only facility in Portage County for the detention of juveniles, up to the time of the trial in 1968, was the juvenile ward on the second floor of the county jail in the courthouse. Now, there is no evidence in this record as to how many juveniles

had been previously placed, committed, or ordered detained in this juvenile ward by the juvenile authorities. The inevitable conclusion is that if the case load of the Juvenile Court of Portage County requires the services of a director of the court and two probation officers, there certainly must have been a large number of juveniles each year placed and detained in the juvenile ward by order of the juvenile authorities.

The trial judge instructed the jury in this case that when Wilbur Garland was placed in and detained in this juvenile ward he was falsely imprisoned and that the defendant sheriff was liable in damages. If that was the correct rule of law to apply, then the defendant sheriff could be held liable in damages for false imprisonment in actions brought in behalf of each and every one of the many juveniles who were placed and detained in this juvenile ward by the orders and direction of the juvenile authorities over a span of years. This logically suggests the query: Should the public policy of the state of Ohio sanction such a result? From 32 American Jurisprudence 2d 95, False Imprisonment, Section 30, we quote:

"* * * But the rule of public policy which protects a police officer in his acts of official duty should be liberally interpreted in the officer's behalf, so far as it reasonably can be done without injustice to others. * * *"

From the issues joined, the evidence in the record and the facets involved in this case, we conclude that the trial court erred in directing a verdict for the plaintiff.

On the essential element of the intent to unlawfully restrain and detain Wilbur, we hold that reasonable minds could come to but one conclusion, that is, from the evidence, there was no such intent on the part of the sheriff's deputies.

On the essential element of false imprisonment requiring an unreasonable detention, we find from the evidence that reasonable minds could come to but one conclusion, that the detention by the deputies of Wilbur was not an unreasonable detention but was for the best interests and welfare of the boy.

Considering the authorities and the sections of the Juvenile Code of Ohio cited in this opinion, we conclude, as a matter of law, that the defendant sheriff, through the acts of his deputies, was justified in detaining the boy, Wilbur, in the custody of his father in the juvenile ward as directed and ordered by the juvenile authorities.

Finally, we hold that, under all of the facts and all of the circumstances involved in this case, liability in damages by the defendant sheriff would contravene and be diametrically opposed to the public policy of the state of Ohio. Therefore, the judgment of the Common Pleas Court of Portage County is reversed and final judgment is hereby entered for the defendants.

*Judgment reversed.*

BROWN and DOYLE, JJ., concur.

BROWN and STRAUB, JJ., of the Sixth Appellate District, and DOYLE, J., of the Ninth Appellate District, sitting by designation in the Eleventh Appellate District.